[Counsel for Plaintiffs are identified
in Plaintiffs' signature blocks]

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA; the STATE OF OREGON; the CONFEDERATED TRIBES OF THE GRAND RONDE COMMUNITY OF OREGON; the CONFEDERATED TRIBES OF SILETZ INDIANS; the CONFEDERATED TRIBES OF THE UMATILLA INDIAN RESERVATION; the CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF OREGON; and the NEZ PERCE TRIBE, | ) ) ) ) ) ) ) ) ) | |
|     Plaintiffs, | ) ) | |
|        v. | ) ) ) | |
| ACF INDUSTRIES, LLC; AIRGAS USA LLC; AIR LIQUIDE AMERICA L.P.; ASH GROVE CEMENT COMPANY; ASHLAND INC.; BEAZER EAST, INC.; BNSF RAILWAY COMPANY; CALBAG METALS CO.; CITY OF PORTLAND; ESCO GROUP LLC; EVRAZ INC. NA (FKA OREGON STEEL MILLS AND GILMORE STEEL); GOULD ELECTRONICS INC.; HAJ, INC., D/B/A CHRISTENSON OIL COMPANY; HERCULES LLC; KOPPERS INC.; MCCALL OIL & CHEMICAL CORPORATION; MCCALL OIL REAL ESTATE COMPANY LLC; MOREC FRONT LLC; GWC PROPERTIES, LLC; GWC FRONT, LLC; TANKER BASIN LLC; MMGL LLC; NORTHWEST PIPE COMPANY (FKA NORTHWEST PIPE & CASING COMPANY AND NORTHWEST PIPE AND CASING COMPANY); PACIFICORP, AN OREGON CORPORATION; PORT OF PORTLAND; PORTLAND GENERAL ELECTRIC COMPANY (PGE); PORTLAND TERMINAL RAILROAD COMPANY; SCHNITZER STEEL INDUSTRIES, INC.; SILTRONIC CORPORATION; SULZER PUMPS (US) INC.; and VALVOLINE INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 3:23-cv-01603-YY<br><br>**PLAINTIFFS' MOTION TO ENTER CONSENT DECREES** |
|     Defendants. | ) | |

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................... iii

INTRODUCTION .................................................................................................. 1

I.     BACKGROUND ....................................................................................... 4

      A.    Portland Harbor Natural Resource Damages ............................... 4

      B.    The Early Settlement Process Injury Assessment ........................ 4

      C.    Defendants' Shares of Natural Resource Damages ..................... 6

      D.    Restoration and the Early Settlement Process ............................. 9

      E.    Terms of the Proposed Decrees .................................................. 10

      F.    Public Comment on the Proposed Consent Decrees .................. 12

II.    STANDARD OF REVIEW ...................................................................... 13

III.   ARGUMENT: THE COURT SHOULD APPROVE THE DECREES
      BECAUSE THEY ARE FAIR, REASONABLE, AND CONSISTENT
      WITH APPLICABLE STATUTES ........................................................ 14

      A.    The Decrees are Procedurally Fair ............................................. 14

      B.    The Decrees are Substantively Fair ........................................... 18

             1.    The Trustees Constructed an Effective and Technically
                   Sound HEA Model To Estimate Total Injury To Natural
                   Resources and Total Required Restoration .................................. 19

             2.    The Settlement, Which Uses the Total Injury Estimate
                     Developed By the Trustees' HEA Model, Is Not Premature ........ 20

                  a.    Early Settlements May Be Based Upon A
                         "Preliminary" Estimate of Damages Before a Formal
                         Damage Assessment Has Been Conducted ...................... 21

                  b.    The Trustees' HEA Model Is Reliable and
                         Reasonable ...................................................................... 22

                  c.    Complete Knowledge of Current or Future
                         Contaminant Loads Is Unnecessary Because the
                         Trustees Used Conservative Assumptions ...................... 22

                    d.    The Estimate of Recreational Losses Is Reasonable ......... 24

3.    The Decrees and the Public Record Sufficiently Support The Shares Allocated To Defendants.................................................. 24

C.    The Decrees Are Reasonable .................................................... 27

D.    The Decrees Are Consistent with the Applicable Statutes ...................... 30

IV.    REQUEST TO ENTER THE CONSENT DECREE........................................... 32

# TABLE OF AUTHORITIES

## Cases

*Arizona v. City of Tucson,*
   761 F.3d 1005 (9th Cir. 2014) ............................................................................. 18

*Bragg v. Robertson,*
   83 F. Supp. 2d 713 (S.D.W. Va. 2000).................................................................. 27

*Mausolf v. Babbitt,*
   85 F.3d 1295 (8th Cir. 1996) ............................................................................... 16

*Officers for Just. v. Civil Serv. Comm'n of San Francisco,*
   688 F.2d 615 (9th Cir. 1982) ............................................................................... 13

*Speed Shore Corp. v. Denda,*
   605 F.2d 469 (9th Cir. 1979) ............................................................................... 13

*United States v. Bd. of Trustees of Univ. of Ill.,*
   No. 07-2188, 2008 WL 345542 (C.D. Ill. Feb. 7, 2008) ........................................ 13

*United States v. Bliss,*
   133 F.R.D. 559 (E.D. Mo. 1990) ......................................................................... 16

*United States v. BP Expl. & Oil Co.,*
   167 F. Supp. 2d 1045 (N.D. Ind. 2001) ................................................................ 17

*United States v. BP Prods. N. Am. Inc.,*
   No. 2:12-CV-207, 2012 WL 5411713 (N.D. Ind. Nov. 6, 2012) ........................... 28

*United States v. Cannons Eng'g Corp.,*
   899 F.2d 79 (1st Cir. 1990).......................................... 13, 14, 17, 18, 27, 30

*United States v. Charles George Trucking, Inc.,*
   34 F.3d 1081 (1st Cir. 1994).............................................................................. 18

*United States v. Charter Int'l Oil Co.,*
   83 F.3d 510 (1st Cir.1996)................................................................................ 18

*United States v. Comunidades Unidas Contra La Contaminacion,*
   204 F.3d 275 (1st Cir. 2000)............................................................................. 17

*United States v. Fort James Operating Co.,*
   313 F. Supp. 2d 902 (E.D. Wis. 2004).............................................................. 27

*United States v. McInnes,*
   556 F.2d 436 (9th Cir. 1977) ............................................................................ 13

*United States v. Metro. St. Louis Sewer Dist.,*
   569 F.3d 829 (8th Cir. 2009)............................................................................. 16

*United States v. Montrose Chem. Corp. of Cal.,*
   50 F.3d 741 (9th Cir. 1995) ............................................... 13, 14, 18, 21, 26

*United States v. Oregon*,
  913 F.2d 576 (9th Cir. 1990) ............................................................ 13

*United States v. Town of Moreau, New York*,
  979 F. Supp. 129 (N.D.N.Y. 1997) .................................................. 17

*Washington v. United States*,
  No. CIV. 06-05225RJB, 2007 WL 3025843 (W.D. Wash. Oct. 15, 2007) ........... 13, 14, 18, 27

## Statutes

16 U.S.C. § 1531 ................................................................................ 28

33 U.S.C. § 1321 ............................................................................ 1, 31

33 U.S.C. § 2702(a) ........................................................................ 30

33 U.S.C. § 2702(b) .......................................................................... 1

33 U.S.C. § 2702(b)(2)(A) .............................................................. 30

42 U.S.C. § 9607(a) ..................................................................... 1, 30

42 U.S.C. § 9607(f)(1) .................................................................. 4, 27

42 U.S.C. § 9613(f)(2) ..................................................................... 27

ORS § 465 .......................................................................................... 1

ORS § 465.255(1) ............................................................................ 31

ORS § 468B.060 ................................................................................ 1

## Rules

Fed. R. Civ. P. 54 & 58 .................................................................... 32

## Regulations

43 C.F.R. § 11.38 ............................................................................ 20

## Other Authorities

88 Fed. Reg. 78063 (Nov. 14, 2023) .............................................. 12

88 Fed. Reg. 88417 (Dec. 21, 2023) .............................................. 12

LR 7-1(a)(4) ........................................................................................ 1

# INTRODUCTION

Plaintiffs the United States (on behalf of the National Oceanic and Atmospheric Administration of the Department of Commerce ("NOAA") and the Department of the Interior), the State of Oregon (on behalf of the Oregon Department of Fish and Wildlife), the Confederated Tribes of the Grand Ronde Community of Oregon, the Confederated Tribes of Siletz Indians, the Confederated Tribes of the Umatilla Indian Reservation, the Confederated Tribes of the Warm Springs Reservation of Oregon, and the Nez Perce Tribe (collectively, the "Trustees") move for entry of the Consent Decrees ("Decrees") lodged in this action on November 1, 2023. Dkt. Nos. 4-1 through 9-1 (Restoration Credit Consent Decree) and 11-1 (Cash-out Consent Decree).[1] The purpose of the Decrees is to resolve Defendants' liability for Plaintiffs' claims under Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a); Section 311 of the Clean Water Act, 33 U.S.C. § 1321; Section 1002(b) of the Oil Pollution Act, 33 U.S.C. § 2702(b); and the Oregon Hazardous Waste and Hazardous Materials Act, ORS § 465, and ORS § 468B.060, for certain natural resource damages resulting from releases of hazardous substances and oil into the Willamette River from the facilities owned and/or operated by Defendants and identified in Appendix A to the Decrees. *See* Dkt. Nos. 4-1 ¶ 3.d and 11-1 ¶ 3.b (Definition of "Covered Natural Resource Damages"); *see also* Dkt. No. 1 ¶ 1 (Complaint).

To resolve liability for natural resource damages, the Decrees require Defendants to: (1) provide compensation for Defendants' equitable shares of natural resource damages through a combination of cash payments to the Trustees and purchases of credits in restoration projects

---

[1] With respect to LR 7-1(a)(4), Defendants in this action have consented not to oppose entry of the Decrees. Dkt. Nos. 4-1 ¶ 104 and 11-1 ¶ 34.

described in detail in the Restoration Credit Consent Decree; and (2) pay their proportionate shares of the costs incurred by the Trustees during the early settlement process, including for the assessment of natural resource damages. *Cash-out Consent Decree*, Dkt. No. 11-1 § VII; *Restoration Credit Consent Decree,* Dkt. No. 4-1 § VIII.  The Restoration Credit Consent Decree also contains extensive requirements for the restoration project developers selling restoration credits under the terms of that Decree, to ensure that the ecological values represented by the restoration credits have been fully developed and will be permanently maintained. *Restoration Credit Consent Decree,* Dkt. No. 4-1 § VII.

The Defendants in the Decrees (16 Defendants in the Cash-Out Consent Decree and 7 Defendants in the Restoration Credit Consent Decree)[2] collectively represent about 11.4% of the estimated total natural resource damages. *Infra* at 8.  The total value of the claims resolved in both Decrees is approximately $36.2 million.  Dkt. Nos. 4-1 ¶ V, 11-1 ¶ Q.  This includes restoration project credits valued by the Trustees at approximately $23.3 million, with the remaining approximately $12.9 million consisting of cash payments (including Defendants' pre-payments and approximately $2.9 million of Trustees' past damage assessment costs).  *See id.*

The proposed Decrees were subject to a seventy-five day public comment period. Plaintiffs received comments from public interest groups, an individual member of the public, other parties who are potentially liable for natural resource damages at the Portland Harbor Superfund Site, and the Confederated Tribes and Bands of the Yakama Nation ("Yakama Nation").[3]  The comments address issues such as the adequacy of the Trustees' Habitat

---

[2] Some Defendants consist of multiple legal entities.

[3] The Yakama Nation is the only natural resource trustee at the Portland Harbor Superfund Site that is not a plaintiff in this action.  As explained in the Response to Comments, the Yakama

Equivalency Analysis model, which was used to estimate natural resources damages and to allocate Defendants' equitable shares of those damages, the appropriateness of early settlements prior to completion by natural resource trustees of a formal damage assessment, and whether the restoration projects in the Restoration Credit Consent Decree are appropriate. All comments received from the public are attached to this Motion as Attachment B. Specific responses to the complete set of public comments are provided in the Response to Comments, which is attached to this Motion as Attachment C.

In the proposed Consent Decrees, Plaintiffs reserved the right to withdraw or withhold their consent if the comments regarding the Consent Decree disclosed facts or circumstances indicating that the Consent Decree is inappropriate, improper, or inadequate. *Cash-out Consent Decree*, Dkt. No. 11-1, ¶ 31; *Restoration Credit Consent Decree,* Dkt. No. 4-1 ¶ 101. Defendants have signed and fully approved the Consent Decrees and have consented to their entry without further notice. *Id.* ¶¶ 34, 104. After carefully reviewing and considering each comment received, Plaintiffs concluded that none of the comments provides a basis to withdraw their consent to these settlements or for this Court to disapprove of the settlements.

This motion to enter summarizes Plaintiffs' responses to the public comments. As explained below, the proposed settlement with Defendants embodied in the Consent Decrees is fair, reasonable, and consistent with the applicable statutes, and accordingly, the Decrees should be entered as final orders of this Court.

---

Nation left the Portland Harbor Natural Resource Trustee Council in 2009 due to a disagreement with the other Trustees over the early restoration settlement approach pursued by the Trustees who are Plaintiffs in this action.

I.      **BACKGROUND**

   **A.  Portland Harbor Natural Resource Damages**

   The Willamette River has been subject to considerable levels of industrial and other uses

by numerous parties throughout its history and into the present.  *Declaration of Troy Baker*

("Baker Decl."), Attachment A, ¶ 6.  Plaintiffs, who are trustees for the natural resources of the

Portland Harbor Superfund Site pursuant to 42 U.S.C. § 9607(f)(1), are working to restore the

natural resources injured by releases of hazardous substances and oil into the Willamette River

and its adjoining shorelines.  These contaminants have had serious impacts on the aquatic

organisms and other natural resources that inhabit, or come into contact with, contaminated

sediments or eat contaminated prey items.  The injured resources include fish and wildlife

species and their habitat.  *Id.* ¶ 6.

   **B.  The Early Settlement Process Injury Assessment**

   For the purpose of negotiating early settlements, including the settlement represented by

the proposed Decrees, the Trustees developed a streamlined process for estimating natural

resource injuries and the restoration required to compensate for those injuries.  *Baker Decl.* ¶ 7.

Plaintiffs analyzed the impacts from hazardous substances and oil to natural resources,

developed restoration strategies, and selected restoration projects to address these impacts.  *Id*.

   The streamlined process uses a model called Habitat Equivalency Analysis ("HEA"),

which is a tool for evaluation of natural resource injuries and required restoration.  *Baker Decl.*

¶ 7.  The HEA is designed to account for the injuries resulting from the range of contaminants in

river sediments and calculate the total combined loss to natural resources over time from those

contaminants.  *Id*.  Because the injuries to natural resources evaluated by the HEA are caused

principally by contaminated river sediments, the HEA measured the injuries in terms of losses of

ecological services provided per acre of affected habitat. *Id*. The HEA model incorporated information from a variety of sources to estimate the extent of injury to natural resources, including information regarding the natural resources historically and currently found in the Portland Harbor Natural Resource Assessment Area ("Assessment Area"), information on contaminant levels in the Assessment Area, environmental studies of impacts to similar resources in similar marine and estuarine environments, state regulatory standards, and scientific literature. *Id.* ¶ 9. In addition, the Trustees and the potentially responsible parties participating in the early restoration process also conducted site-specific studies at Portland Harbor to help quantify the natural resource injuries. *Id*. Relying upon all of this information, the Trustees' HEA model determined the percentage loss of ecological services resulting from increasing sediment concentrations of hazardous substances and oil in the Assessment Area. *Id*.

The HEA also is used to determine the amount of habitat restoration needed to compensate for ecological service losses over time. *Baker Decl.* ¶ 10. The HEA calculated the amount of habitat restoration needed to compensate for a given level of injuries by the gain in ecological services per acre provided by different restoration techniques in different habitats. *Id*. To equate losses from contamination and gains from restoration occurring at different times, the losses and gains were converted to a common, present value. *Id*. The resulting measure of natural resource damages is discounted service acre-years, or "DSAYs." *Id.* ¶¶ 9–10. Sufficient restoration is determined to be the number of acres of a particular type of restoration that generates the same amount of DSAYs as were lost due to the injury. *Id.* ¶ 10. For the purposes of early settlements, the Trustees estimated the damages for the Assessment Area as a whole—and thus the quantum required for restoration—to be 4,130 DSAYs. *Id*; *Cash-out Consent Decree*, Dkt. No. 11-1 ¶ K; *Restoration Credit Consent Decree,* Dkt. No. 4-1 ¶ P.

The HEA was then used to assign ecological losses to individual facilities. *Baker Decl.* ¶¶ 11–12. The Trustees used two basic approaches in the Assessment Area. First, for most hazardous substances, there was a "footprint" of contamination in the sediments that was attributed to particular facilities or properties. Second, for more ubiquitous and diffuse contaminants, such as polycyclic aromatic hydrocarbons ("PAHs"), multiple facilities or properties often contributed to a contamination footprint, in which case a relative index approach was used, where liability was divided among the facilities and properties that were known to have released the ubiquitous and diffuse contaminants. *Id.* ¶ 13. This division among facilities and properties was based on the nature of the waste-producing activities located at the facility or property, the area involved and the time period during which these activities occurred. Using this methodology, responsibility for virtually all contaminated sediment footprints in the Assessment Area were assigned to properties and facilities near or adjacent to the Assessment Area.[4] *Id.* ¶ 13. Once the HEA assigned ecological losses (measured in DSAYs) to each Defendant's properties and/or facilities, the total number of DSAYs for that Settling Defendant was then calculated by adding the DSAYs attributed to each such property and/or facility. *Id.* ¶ 14.

### C. Defendants' Shares of Natural Resource Damages

As alleged in the Complaint, Defendants own and/or operate, or in the past owned and/or operated, real property and/or facilities, at or from which there have been releases of hazardous substances and/or discharges of oil to the Assessment Area. *Compl.*, Dkt. No. 1 ¶¶

---

[4] In rare cases, it was not possible to assign contaminant footprints to properties near or adjacent to the Assessment Area, primarily where a contaminant footprint was not in sufficient proximity to any known source of that contaminant. These instances represent less than 3% of the HEA's total injury estimate. *Baker Decl.* ¶ 13.

16, 18. These facilities and properties are identified for each Defendant in Appendix A of the Complaint and Appendix A of the Decrees. Dkt. No. 1, App. A; Dkt. No. 4-1, App. A; Dkt. No. 11-1, App. A.

The early settlement allocation process for each Defendant began with an identification by each Defendant of its currently or formerly owned and/or operated facilities and properties. *Baker Decl.* ¶ 12. The Decrees resolve Defendants' natural resource damages liabilities only for facilities and properties identified in the Decrees. *See* Dkt. Nos. 4-1 ¶ 3.d and 11-1 ¶ 3.b (Definition of "Covered Natural Resource Damages"). Each Defendant submitted information regarding its activities and operations for these identified properties, which the Trustees reviewed for accuracy. *Baker Decl.* ¶ 12. Based on this information, the Trustees determined the contaminants likely associated with these activities. *Id*.

Contaminants associated with activities at Defendants' properties and facilities were then compared with contaminant footprints in Willamette River sediments in the Assessment Area. *Baker Decl.* ¶ 12. Properties and facilities were allocated liability (in DSAYs) where each of the following criteria was met: there was a pathway for contaminants to travel from the property or facility to the Willamette River; contaminants associated with activities on Defendant's property or facility were found in contaminated sediment footprints; and those footprints were in sufficiently close proximity to the property or facility, or a site-related outfall to the Willamette River. *Baker Decl.* ¶ 12; *see also* Dkt. Nos. 4-1 ¶ S and 11-1 ¶ N. If a connection existed between contaminated sediments and a Defendant's property or facility, then that property or facility was assigned natural resource damages liability for the contaminated footprint. The amount of assigned liability (in DSAYs) depended on the estimated injury to natural resources

(in DSAYs) caused by contaminants in the sediment footprint and whether other properties and facilities also contributed contaminants to that footprint. *Baker Decl.* ¶ 12.

Using the above process at each property or facility identified by a Defendant, the Trustees developed a proposed liability allocation, in DSAYs, for that Defendant. *Baker Decl.* ¶ 14. The Trustees then shared their proposed allocation with that Defendant, including the factual basis for that allocation. Each Defendant was given an opportunity to review its proposed allocation and to provide additional information if it disagreed with the factual basis for the Trustees' proposed allocation. *Id.* If the Trustees agreed that the additional information warranted revisions to the factual basis of their initial allocation, revisions to the factual basis and associated DSAY allocations were made. No significant revisions were made to allocations without a supporting factual basis, such as information establishing that a Defendant did not use a particular type of process or chemical; only modest equitable downward revisions based on "litigation risk" or other forms of "uncertainty" were made in negotiations with individual Defendants. *Id.*

The shares in Appendix C of the Decrees reflect the results of the negotiations between the Trustees and each Defendant. Together, Defendants were assigned a total of 471.389 DSAYs, which represents about 11.4% of the estimated total natural resource damages for the Assessment Area.[5] *Baker Decl.* ¶ 15. Negotiations with additional potentially responsible parties ("PRPs") in the early settlement process are ongoing, and if further settlements are

---

[5] Plaintiffs believe that the allocation process here goes far beyond what is required under applicable law and should not be regarded as a minimum for other settlements in other cases. The financial and technical resources required for the HEA process used here may not be available at other sites. *Baker Decl*. ¶ 16.

reached, the Trustees anticipate lodging additional consent decrees embodying those settlements. *Id.*; Dkt. Nos. 4-1 ¶ W, 11-1 ¶ R.

### D. Restoration and the Early Settlement Process

In addition to assessing injuries to natural resources, the early settlement process also developed a restoration strategy and selected restoration projects that could be included in settlements with PRPs. *Baker Decl.* ¶ 17. A draft Programmatic Restoration Plan and Environmental Impact Statement (PEIS) was released for public comment in 2012, and the Trustees published the final document and response to comments in 2017. *Id.* The PEIS included the Trustees' integrated restoration approach as the preferred alternative and provided details on the Trustees' goals and objectives for ecological restoration, target species, and monitoring and stewardship expectations. *Id.* The PEIS also identified 44 projects as examples of the types of ecological restoration projects that might ultimately be implemented (including all four of the restoration projects the Trustees included in the Restoration Credit Consent Decree in 2023). *Id.*

Following the PEIS, the Trustees developed a Supplemental Restoration Plan and Environmental Assessment ("SRP"), in which the Trustees identified the purchase of credits from restoration banks as the preferred alternative for ecological restoration during this phase of the NRDA and identified and evaluated the four restoration projects included in the Restoration Credit Consent Decree. *Baker Decl.* ¶ 18. The Trustees published the draft SRP for public comment in 2020 and published the final document, including a response to public comments, in 2021. *Id.*

### E.  Terms of the Proposed Decrees

The proposed settlement between Plaintiffs and Defendants is embodied in two separate consent decrees.  The Defendants in the Cash-out Consent Decree are resolving their liabilities for Covered Natural Resource Damages on an all-cash basis.  Defendants' payments under this Decree fully fund their allocated shares for injuries to natural resources in the amount of $70,500 per allocated DSAY.  Dkt. No. 11-1 ¶¶ K, 7 & App. C.  In addition, Defendants participating in the Cash-out Consent Decree will make payments for the Trustees' past costs (through April 1, 2020) and the Trustees' interim costs (between April 1, 2020, and the Effective Date of the Cash-out Consent Decree).  *Id.* ¶¶ 8–10.

Defendants participating in the Restoration Credit Consent Decree will address their responsibilities for ecological injury by purchasing restoration credits in one or more of the four restoration projects identified in that Decree.  Dkt. No. 4-1 ¶¶ H, P, 70; Dkt. No. 4-4 (App. C). In addition, Defendants in the Restoration Credit Consent Decree pay $1,742 per allocated DSAY (which covers recreational service losses, tribal service losses, and Portland Harbor-wide monitoring and stewardship) for each restoration credit they purchase in one of the four restoration projects.  Dkt. No. 4-4 (App. C) at 1 n.2.  Like the Defendants in the Cash-out Consent Decree, Defendants in the Restoration Credit Consent Decree are paying their proportionate share of the Trustees' past and interim costs.  Dkt. No. 4-1  ¶¶ 71–73.

The developers of the four restoration projects in the Restoration Credit Consent Decree are parties to that Decree.  That Decree contains a number of commitments by the project developers to ensure that the restoration projects in which restoration credits are purchased continue to maintain their ecological values.  Dkt. No. 4-1 § VII.  Each project developer must construct its restoration project and develop and maintain the habitat and vegetation as set forth

in the Habitat Development Plan for each project. *Id.* ¶¶ 18, 27. The project developers also must ensure that the restoration projects are permanently dedicated to the projects' ecological purpose, which includes both legal protections for the project sites and funding long-term stewardship to manage the projects after they are fully developed. *Id.* § VII.E. All of these commitments by project developers are secured by liquid performance guarantees in the forms of bonds, irrevocable letters of credits, and/or escrow accounts. *Id.* § VII.G. The Decree also requires project developers to reimburse the Trustees for their costs of overseeing implementation of the projects. *Id.* § VII.J.

The Restoration Credit Consent Decree also contains mechanisms to ensure that restoration credits accepted by the Trustees from each project represent on-the-ground ecological value. Dkt. No. 4-1 § VII.F. Those mechanisms include identifying the number of restoration credits in each project that the Trustees have authorized to date, a Credit Release Schedule for each project that ties additional releases of restoration credits to achievement of success criteria, and Trustee authority to re-assess, if needed, the value of a project. *Id.* ¶¶ 42–43, 47–51. In addition, the Decree requires the restoration project developers to disclose to the Trustees all sales of credits in their restoration projects and to maintain a Trustee-approved registry of all such sales. *Id.* ¶¶ 45–46. The Trustees will accept restoration credits from a restoration project in a settlement only if the project has sufficient remaining credits, taking into consideration credits that the Trustees have previously approved and credits that already have been sold. *Id.* ¶ 44.

In consideration of Defendants' commitments in the Decrees, Plaintiffs covenant not to sue Defendants for natural resource damages resulting from releases of hazardous substances or discharges of oil prior to the Effective Date from the properties and facilities identified in the

Decree into the Assessment Area.  Dkt. Nos. 4-1 ¶ 3.d and 11-1 ¶ 3.b (Definition of "Covered

Natural Resource Damages"); Dkt. Nos. 4-1 § XIII and 11-1 § IX (Covenant Not to Sue by

Plaintiffs).  Plaintiffs' covenant is subject to reservations of rights, Dkt. Nos. 4-1 § XIV and 11-1

§ X, as well as "the right to institute proceedings against Settling Defendants [. . .] for: Covered

Natural Resource Damages if conditions, factors or information in the Portland Harbor Natural

Resource Damage Assessment Area, not known to the Trustees as of the Effective Date of this

Consent Decree, are discovered that, together with any other relevant information, indicates that

there is injury to, destruction of, loss of and/or loss of use of natural resources of a type

unknown, or of a magnitude significantly greater than was known, to the Trustees as of the

Effective Date."  Dkt. Nos. 4-1 § XV and 11-1 § XI.  The Decrees also provide Defendants with

protection from contribution actions or claims by other liable parties for Covered Natural

Resource Damages.  Dkt. Nos. 4-1 ¶ 89 and 11-1 ¶ 21.

**F.  Public Comment on the Proposed Consent Decrees**

Public comments on the Consent Decrees were accepted for a total of seventy-five days

following publication of notice of the Decrees in the Federal Register.  A notice of lodging of the

Decrees was published in the Federal Register, which provided a 45-day public comment period.

88 Fed. Reg. 78063 (Nov. 14, 2023).  In response to a request to extend the public comment

period, the comment period was extended for 30 days.  88 Fed. Reg. 88417 (Dec. 21, 2023).

Plaintiffs received seven lengthy public comments, including from an individual, public interest

groups, potentially responsible parties who are not Defendants in the Decrees, and the Yakama

Nation.  Those public comments, and Plaintiffs' responses to those comments, are set out in full

in attachments to this motion to enter the Decrees.  Attachments B & C, respectively.

## II.    STANDARD OF REVIEW

The standard of review for the proposed Consent Decrees is whether they are fair, reasonable, and consistent with the objectives of the relevant statutes. *United States v. Montrose Chem. Corp. of Cal.*, 50 F.3d 741, 743 (9th Cir. 1995) (discussing natural resource damages under CERCLA); *see also United States v. Bd. of Trustees of Univ. of Ill.*, No. 07-2188, 2008 WL 345542, at *2 (C.D. Ill. Feb. 7, 2008) (discussing natural resources consent decree under Clean Water Act).

The decision to approve a proposed consent decree is committed to the informed discretion of the district court, *United States v. Oregon*, 913 F.2d 576, 580 (9th Cir. 1990), and the court's review is informed by the "overriding public interest in settling and quieting litigation." *United States v. McInnes*, 556 F.2d 436, 441 (9th Cir. 1977); *see also Speed Shore Corp. v. Denda*, 605 F.2d 469, 473 (9th Cir. 1979) ("Settlement agreements conserve judicial time and limit expensive litigation."). Proposed consent decrees in CERCLA cases are entitled to deference from the court reviewing the decree. *Montrose Chem. Corp.*, 50 F.3d at 746; *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990). The judicial policy favoring settlements "is strengthened when a government agency charged with protecting the public interest 'has pulled the laboring oar in constructing the proposed settlement.'" *Montrose Chem. Corp.*, 50 F.3d at 746 (quoting *Cannons Eng'g Corp.*, 899 F.2d 79 at 84). "[T]he reviewing court's role is to 'scrutinize' the settlement, but the acting governmental units are entitled to some deference." *Washington v. United States*, No. CIV. 06-05225RJB, 2007 WL 3025843, at *5 (W.D. Wash. Oct. 15, 2007) (citing *Montrose Chem. Corp.*, 50 F.3d at 747); *see also Officers for Just. v. Civil Serv. Comm'n of San Francisco*, 688 F.2d 615, 630 (9th Cir. 1982) (a court is

not "empowered to rewrite the settlement agreed upon by the parties," or to "delete, modify, or substitute certain provisions of the consent decree").

## III.    ARGUMENT: THE COURT SHOULD APPROVE THE DECREES BECAUSE THEY ARE FAIR, REASONABLE, AND CONSISTENT WITH APPLICABLE STATUTES

The proposed Consent Decrees satisfy the three-part test for district court approval of a settlement: The Decrees are fair, reasonable, and consistent with CERCLA, CWA, OPA, and Oregon Hazardous Waste and Hazardous Materials Act. Accordingly, the Court should enter the Decrees. This part of the motion addresses the most common or otherwise significant public comments received on the proposed Decrees as part of the analysis of whether the proposed Decrees meet the three-part test. A more extensive summary of the public comments and responses to the specific issues raised in the comments are set forth in the Response to Comments ("RC"), Attachment C.

### A.  The Decrees are Procedurally Fair

The determination of whether a consent decree is "fair" requires the reviewing court to conduct a two-pronged inquiry, assessing "whether the decree was both (1) the product of a procedurally fair process, and (2) substantively fair to the parties in light of a reasonable reading of the facts." *Montrose Chem. Corp.*, 50 F.3d at 746.

The Decrees are the result of a procedurally fair process. "In measuring procedural fairness, 'a court should ordinarily look to the negotiation process and attempt to engage its candor, openness, and bargaining balance.'" *Washington v. United States*, 2007 WL 3025843, at *6 (citing *Cannons Eng'g Corp.*, 899 F.2d at 86). Courts find procedural fairness where the settlement was negotiated at arm's length among experienced counsel. *See, e.g., Cannons Eng'g Corp.*, 899 F.2d at 84; *Washington v. United States*, 2007 WL 3025843, at *6. Here, the

Trustees invited potentially responsible parties to participate in early settlement discussions. The Trustees have negotiated, and continue to negotiate, with PRPs that joined that early settlement process. *Baker Decl.* ¶ 15. Defendants elected to participate in this early settlement process. Both Plaintiffs and Defendants were represented by experienced counsel in the negotiation process, which involved agreement to fund studies of injuries to natural resources in the Assessment Area and many technical and legal exchanges over a number of years, to reach agreement on the terms of the proposed Decrees and each Defendant's share of responsibility. *See id.* ¶¶ 7, 11–12, 14–15.

Two comments questioned the Trustees' early settlement process from a procedural standpoint. First, Arkema asserted that the early settlement process for the Trustees' natural resource damage claims could undermine the separate non-judicial allocation for Portland Harbor that has been ongoing since approximately 2011 to address the costs of clean-up being overseen by the Environmental Protection Agency ("EPA"). RC, Arkema Section C, Attachment C at 27–29. To address this concern, the Consent Decrees contain provisions that expressly prohibit Defendants in those Decrees from using the Decrees (presumably against other parties who are not Defendants in the Decrees) in any other forum. The prohibition is broadly worded to include the ongoing non-judicial allocation of response costs as well as any future lawsuits. Dkt. Nos. 4-1 ¶ 90 and 11-1 ¶ 22; RC at 30. Moreover, the expressed concern that non-parties (including judges) would use the settlements against other non-parties seems both speculative and highly unlikely. RC at 30–31 & n.70.

Arkema's comment also questions why the United States sought a stay in the natural resource damages suit filed in 2017 by the Yakama Nation but is proceeding to settle natural resource damage claims in the Decrees. This comment ignores the fact that litigating the

Yakama Nation natural resource damages case, which names many of the same parties to the non-judicial allocation, could have upset the remedial settlement process by putting at issue the same liability and allocation topics addressed in the non-judicial allocation. By contrast, settling natural resource damage claims—as the Decrees do—*avoids* putting at issue those same topics. RC at 31.[6]

Willamette Riverkeeper asserted that the NRDA process should be more inclusive and transparent to the public, and that public outreach by the Trustees has been too infrequent. RC, Riverkeeper Section 2 at 102. In response, Plaintiffs acknowledge that the negotiations in this case were complex, highly technical, sensitive, and took a number of years. There was no cloak of secrecy but, like virtually all negotiations, they were not held in the public arena. "[A] federal case is a limited affair, and not everyone with an opinion is invited to attend." *United States v. Metro. St. Louis Sewer Dist.*, 569 F.3d 829, 841 (8th Cir. 2009) (quoting *Mausolf v. Babbitt*, 85 F.3d 1295, 1301 (8th Cir. 1996). "The confidentiality of the negotiations does not have any bearing on the candor, openness, and bargaining balance as between the parties to the negotiation . . .." *United States v. Bliss*, 133 F.R.D. 559, 569 (E.D. Mo. 1990). Had the negotiations taken place in public, reaching an agreement may well have been impossible, and certainly would have taken much longer.

There is no requirement under CERCLA, the CWA, OPA, and the Oregon Hazardous Waste and Hazardous Materials Act, or by the Trustees or the United States in general, to conduct settlement negotiations in public. "[T]he government is under no obligation to telegraph

---

[6] Plaintiffs agree with comments by Arkema and others that this case is related to both the ongoing non-judicial response cost allocation and the natural resource litigation filed by the Yakama Nation in 2017. A Notice of Related Cases is filed concurrently with this motion. *See also* RC at 39–40.

its settlement offers, divulge its negotiating strategy in advance, or surrender the normal

prerogatives of strategic flexibility which any negotiator cherishes." *Cannons Eng'g Corp.*, 899

F.2d at 93; *see also United States v. Comunidades Unidas Contra La Contaminacion*, 204 F.3d

275, 277 (1st Cir. 2000) (court rejected objections to a settlement based upon lack of

participation by intervener in negotiations); *United States v. Town of Moreau, New York*, 979 F.

Supp. 129, 135–36 (N.D.N.Y. 1997) ("it is doubtful that a public settlement conference would

ever permit the type of give and take that would lead to an agreed resolution of the dispute").

Likewise, there is no requirement that the Government allow third parties to participate in the

settlement negotiations. *United States v. BP Expl. & Oil Co.*, 167 F. Supp. 2d 1045, 1052 (N.D.

Ind. 2001).

Within the limits of confidential settlement discussions, the Trustees have engaged in

public outreach and coordination, providing detailed information about the injury investigations

being conducted, the restoration process generally, and specific restoration projects. RC,

Riverkeeper Section 2 at 103–105. To support their public outreach and engagement efforts, the

Trustees maintain a consistently growing public record that, as of this writing, contains over 700

documents, ranging from detailed technical reports to simple fact sheets. Where the Trustees felt

more easily-digestible information would be useful to the public, they provided materials such as

newsletters and YouTube videos. RC, Riverkeeper Section 2 at 103. They also periodically

attended public meetings held by community groups to provide in-person outreach. RC,

Riverkeeper Section 2 at 104–105. Arguably the Trustees' most important public engagement

has been the thorough and concerted outreach conducted at various points in the NRDA process

where public engagement is encouraged in the CERCLA regulations. One such example is their

development of the PEIS. The Trustees held a three-month long public comment period after

they released their Draft PEIS, which they advertised to the public using multiple forms of outreach.  During this comment period, the Trustees also held two public meetings.  The Trustees considered and addressed comments received from the public during this review process before the Trustees issued a final PEIS.  *Id.*  In sum, the early settlement process appropriately balanced the rights of Defendants, parties in other processes such as the ongoing non-judicial allocation of clean-up costs, and the public.

### B.  The Decrees are Substantively Fair

The proposed Decrees are substantively fair.  Substantive fairness derives from "concepts of corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible." *Cannons Eng'g Corp.*, 899 F.2d at 87.  Because these concepts are not easily quantified in environmental cases, the government's expertise and conclusions receive "the benefit of the doubt when weighing substantive fairness." *Id*. at 88.  As the Ninth Circuit has explained, in the context of a consent decree for natural resource damages "the proper way to gauge the adequacy of settlement amounts to be paid by settling [parties] is *to compare the proportion of total projected costs to be paid by the settlors with the proportion of liability attributable to them,* and then to factor into the equation any reasonable discounts for litigation risks, time savings, and the like that may be justified." *Montrose Chem. Corp.*, 50 F.3d at 747 (emphasis in original) (citing *United States v. Charles George Trucking, Inc.,* 34 F.3d 1081, 1087 (1st Cir. 1994)); *see also Arizona v. City of Tucson*, 761 F.3d 1005, 1012 (9th Cir. 2014) ("in order to approve a CERCLA consent decree, a district court must find that the agreement is 'based upon, and roughly correlated with, some acceptable measure of comparative fault'" (quoting *United States v. Charter Int'l Oil Co.,* 83 F.3d 510, 521 (1st Cir.1996)); *Washington v. United States*, 2007 WL 3025843, at *7.

Some of the public comments questioned the fairness or appropriateness of the Decrees, both with respect to the estimate of total injury and the allocations to Defendants. As described below and in more detail in the responses to public comments, the Trustees conducted a thorough process for estimating total injuries to natural resources in the Assessment Area, for measuring restoration to compensate for those injuries, and for allocating liability to Defendants.

  **1. The Trustees Constructed an Effective and Technically Sound HEA Model To Estimate Total Injury To Natural Resources and Total Required Restoration**

One commenter stated that the Trustees erroneously used the HEA methodology by over-counting the amount of restoration (as measured in DSAYs) that each acre of restored habitat in the four restoration projects provides. RC at 1–7. The comment appears to be based on the erroneous belief that the maximum value of a restoration project (in DSAYs) would be the project's acreage. Based on this assumption, the comment then includes a number of calculations that produce DSAY values for each restoration project far below the DSAY values determined by the Trustees. *Id* at 2, 5–7. The commenter's DSAY value calculations are much closer to the *annual* DSAY value of each restoration project than to the DSAY values for the *entire life* of those projects. RC at 2–3, 5–7.

The comment misunderstands the fact that DSAYs are discounted service acre *years*, which means that the total number of DSAYs credited to a restoration project is calculated by adding up the amount of increased habitat value produced by the project *each year*. DSAYs are not measured in acres (a static spatial measure) but instead are measured in service-acre-years, which have not only a spatial component but also a time and quality component. *See* RC at 8–9. The fact that HEA models measure both injury and restoration year-by-year, with discount factors to adjust for the year when the injury or restoration occurs, is what allows HEA models to

calibrate restoration (which occurs later in time) to injury (which occurs earlier in time).  RC at 9.  In practice, this means that habitat restoration addressing injuries to natural resources that is developed sooner will be worth more (in DSAYs) than the same habitat restoration if it is developed later.  *Id.* at 11–12.

In sum, the HEA developed by the Trustees for Portland Harbor correctly applies the standard HEA methodology that is used nation-wide (by federal, state, and private practitioners).  The ability of that methodology to calculate the quantum of restoration required to compensate for injuries that occur earlier in time is a key reason why the HEA model, using DSAYs as a measure of value, is an appropriate tool for natural resource damage settlements.  RC at 9–10, 12–14.

### 2. The Settlement, Which Uses the Total Injury Estimate Developed By the Trustees' HEA Model, Is Not Premature

Several comments argue in various ways that the Trustees must wait until their ongoing formal damage assessment is complete and/or EPA's cleanup is largely complete before reaching any settlements of natural resource damages claims.  The crux of these comments—that natural resource trustees generally may not reach early settlements of NRD claims and that the Portland Harbor Trustees should not do so here—is simply incorrect.  The statute is structured to encourage early settlements, and the relevant case law recognizes that "preliminary" estimates of damages may be the basis of those settlements.  The HEA model's estimate of damages here is a reasonable basis for the settlement embodied in the Decrees.[7]

---

[7] The Trustees' HEA model was developed specifically for the early settlement process and thus is a "preliminary" estimate of damages.  CERCLA's regulations also provide for a "preliminary estimate of damages," which is a different, optional step in the formal damage assessment process.  *See* 43 C.F.R. § 11.38.

a.    **Early Settlements May Be Based Upon A "Preliminary"**
**Estimate of Damages Before a Formal Damage Assessment**
**Has Been Conducted**

Arkema commented that the fairness of settlements cannot be evaluated until the Trustees have completed a formal damage assessment. Arkema Comment Section A, RC at 15–16. This argument is not supported by the applicable case law, including the cases cited in Arkema's comment. The leading case on this issue is *Montrose Chem. Corp.,* 50 F.3d 741, which evaluated the adequacy of a settlement of natural resource damage claims. *Montrose* concludes its discussion of early settlements by noting with approval "CERCLA's primary goal of encouraging early settlement." 50 F.3d at 748. Thus, not only are early settlements permissible under CERCLA, early settlements are "encouraged."

In addition, *Montrose* specifically notes that "preliminary" or "current" estimates of damages may be the basis of early settlements. *Id.* at 745, 747. The difficulty with the proposed consent decree in *Montrose* was that there was no estimate of total damages *at all*—"preliminary or otherwise"—for the reviewing court to compare with the commitments by defendants under the consent decree. The discussion in *Montrose* makes clear that, where trustees have developed an estimate of total damages, "preliminary or otherwise," that estimate may be the basis of settlement. *Id*. at 746–47.

In this case, the HEA model employed by the Trustees is the most common type of methodology used for natural resource damage settlements, and the Trustees expended significant effort to build a HEA model that would produce a reasonable estimate of total damages for Portland Harbor. RC at 18. Moreover, Arkema's assumption that a formal damage assessment necessarily will produce a larger estimate of total damages is not well-grounded: while the formal damage assessment will be based on more site-specific injury studies than the

HEA model, the outcome of those studies is not yet known (and was not known when the

settlements with Defendants were negotiated). Therefore, the total damage estimate in the

formal damage assessment could be higher or lower than the estimate produced by the HEA

model used for the Decrees.[8]  RC at 18–19.

### b.  The Trustees' HEA Model Is Reliable and Reasonable

Arkema's second comment is closely related to the comment above: that because the

Trustees are not using their HEA model for their formal damage assessment, it necessarily must

be inadequate for use in settlement.  Arkema Comment Section B, RC at 23–24.  However, the

Trustees carefully considered whether it was appropriate to adapt the HEA model originally used

for Commencement Bay in Tacoma, Washington, to the Portland Harbor environment.  RC at

25–26.  In doing so, the Trustees considered, among other factors, the different natural resources

and different regulatory criteria at Portland Harbor.  *Id*.  The fact that the Trustees' formal

damage assessment methodology will be different from the HEA model used for early

settlements and will include additional studies not included in the HEA model, does not mean

that the HEA methodology itself is unreasonable or that it should not be used as a basis for

settlement.  *Id*. at 17–19.

### c.  Complete Knowledge of Current or Future Contaminant Loads Is Unnecessary Because the Trustees Used Conservative Assumptions

Commenters Gunderson and FMC assert that uncertainty about when contaminant loads

will be remediated renders the Trustees' estimate of total damages too uncertain to be used in

---

[8] The comment also contains a criticism of the estimated total dollar value of the relief obtained
under the Consent Decrees that fails to properly account for payments previously made by
Defendants and the value of the restoration credits purchased by Defendants under the
Restoration Credit Consent Decree.  RC at 20–22.

settlement.  RC at 54–55.  These comments argue that the total extent of contaminant exposure to natural resources cannot be known until contamination at Portland Harbor is more fully addressed and that the Decrees are deficient because they contain no requirements that the Defendants address their contamination.  *Id*.

In part, these comments echo Arkema's comments above that early settlements of natural resource damages claims are inappropriate, but that suggestion is contrary to both CERCLA's purposes and the caselaw.  *Supra* at 20–21.  With respect to the specific points regarding clean-up of contaminants, the comments overlook two key points.  First, although the precise pace of EPA's cleanup—and thus, the time period over which natural resources will be exposed to harmful levels of contaminants—is unknown, the Trustees' HEA model conservatively assumed that the cleanup would not include any active remediation.  This assumption meant that contaminant loads declined very gradually over time in the HEA model, when in fact, EPA's remedy includes a significant amount of active remediation of contaminants.  Therefore, even if the particulars of future contaminant remediation in various parts of the Assessment Area are unknown, it can be said today that the HEA model *overestimates* future contaminant exposure to natural resources.  Contrary to the comments, this provides more certainty, not less, that the HEA model sufficiently captures future harm to natural resources from current contamination.  RC at 56–57.

Second, the fact that natural resources will continue to be exposed to contamination after this settlement does not mean that it is the Trustees' role within CERCLA's statutory framework to address this contamination.  Rather, CERCLA places clean up responsibility on regulatory agencies—principally, EPA and its state counterparts.  RC at 57–58.  Courts generally have recognized that trustees may conclude natural resource damage settlements with liable parties

before EPA's cleanup activities are concluded, and that they may do so without seeking to step into EPA's role of regulating the scope and extent of cleanup. *Id*. at 58.

### d.  The Estimate of Recreational Losses Is Reasonable

A relatively small fraction of the Trustees' total damage estimate is the lost recreational use, in dollar terms, resulting from releases of contaminants into the Assessment Area.  The Decrees estimate harbor-wide recreational losses at $5,402,400.  Dkt. Nos. 4-1 ¶ P, 11-1 ¶ K. Willamette Riverkeeper expressed concern that this amount underestimated the extent of recreational losses due to the types of limitations on recreational activities resulting from the contamination and the long period of those limitations.  Riverkeeper Section 5, RC at 110.

The Trustees agree that the contamination has diminished both the extent and the quality of recreational experiences in the Willamette River Assessment Area.  In quantifying the recreational loss for settlement, the Trustees followed both the applicable CERCLA regulations and the Portland Harbor Superfund Site Natural Resource Damage Assessment Plan.  RC at 111. The Trustees' estimate of losses is based on data from the State of Oregon on the number of fishing and boating trips and on the economic values of those trips taken from applicable literature.  *Id.*

### 3.  The Decrees and the Public Record Sufficiently Support The Shares Allocated To Defendants

Several commenters asserted that there is not enough information in the settlement to evaluate whether the Defendants are paying their fair share of the total damages.  Gunderson Section 1, Yakama Nation Section 3, Willamette Riverkeeper Section 1, RC at 41–46.  These comments each describe the information in the Decrees themselves, but they contain little if any discussion of the accompanying information in the Trustees' public record.  While the public record does not contain settlement confidential information, such as the Trustees' detailed

calculations of each Defendant's liability, it does contain substantial information about the following: the Trustees' HEA methodology; the contaminant datasets used by the Trustees in the HEA model; and each Defendant's activities and the Trustees' conclusions about the contamination associated with those activities. RC at 47. This information, coupled with the shares allocated to each Defendant, is sufficient to assess whether the allocations to Defendants are fair.

Two documents in the public record provide significant information about the data and methodologies used to construct the Trustees' HEA model. The first document includes discussion of contaminant sampling used to estimate the extent and concentrations of contaminant footprints, the ecological service loss percentages associated with levels of those contaminants, the ecological values assigned to habitat types, and the methodology for allocating injuries from injured habitat to nearby properties. RC at 48. The second document provides more detail about allocating injuries from river sediment footprints to adjacent properties, methods for allocating injuries attributed to a property to the various operations and associated parties that operated over time on that property, and an appendix that describes the contaminants associated with each different type of activity considered by the HEA model that took place on the properties identified in Appendix A of the Decrees. *Id*.

The above descriptions of the HEA methodology relate to additional information that is provided for each Defendant. Appendix A to the Decrees contains property identifications by parcel number and/or maps showing each Defendant's properties and facilities that were considered by the Trustees in the allocation process. Dkt. Nos. 4-2 (Restoration Credit Consent Decree App. A), 11-1 at 68–114 (Cash-Out Consent Decree App. A). For each Defendant, the Trustees developed a report that describes the properties considered, a description of the

operations on those properties and the time periods when they took place, and the activities associated with those properties (from which the contaminants associated with those activities were determined using the appendix described above). RC at 49.

All of this information allows commenters and others to verify that the Trustees fully reviewed the operations and activities conducted by Defendants, including associated contaminants, and that no operations or activities conducted by Defendants were overlooked by the Trustees. Commenters did not identify any instances, including for any Defendant specifically mentioned in the comments such as the City of Portland and Schnitzer Steel, RC at 50–51, in which an operation or activity conducted by a Defendant was overlooked by the Trustees.

In short, the Trustees' HEA model used relevant information about sediment contaminants and the operations and activities on Defendants' properties that contributed to those contaminants, and it used appropriate factors and analysis to develop allocations to account for the relationship between contaminants from Defendants' activities and the harm to natural resources resulting from contaminated sediments. The Decrees assess Defendants' combined allocated share at 11.4% of the total of estimated natural resource damages for the Assessment Area. While the detailed calculations used for each Defendant remain settlement confidential, operations, activities, associated contaminants, and contaminant data all are in the public record, and no comment raises serious doubt that important information or factors were overlooked. RC at 49–52. Under the generous standard of review applicable here, the Trustees have more than demonstrated that their allocation methodology is fair.[9] *Montrose Chem. Corp.*, 50 F.3d at 746

---

[9] In any future Portland Harbor natural resource damages litigation, the effect of the Decrees on that litigation would derive from the total amount recovered from Defendants under the Decrees,

(noting that deference is appropriate to consent decrees negotiated by public agencies); *United States v. Fort James Operating Co.,* 313 F. Supp. 2d 902, 908–909 (E.D. Wis. 2004) (acknowledging that even substantial discounts are allowable to achieve early settlements in CERLCA cases).

### C.  The Decrees Are Reasonable

Factors relevant in the Court's evaluation of the "reasonableness" of a consent decree are (1) "the decree's likely efficaciousness as a vehicle for cleansing the environment" and (2) "whether the settlement satisfactorily compensates the public."  *Cannons Eng'g Corp.*, 899 F.2d at 89–90; *see also Washington v. United States*, 2007 WL 3025843, at *7 (listing additional factors).  The Decrees are effective vehicles for addressing injuries to the environment because they require Defendants to make payments or purchase credits in habitat restoration projects designed to restore natural resources injured by Defendants' releases in the Assessment Area. The Decrees also include provisions to ensure that the restoration projects are fully developed, including permanent stewardship of the projects after full development has been achieved.  The proposed settlement embodied in the Decrees therefore provides appropriate compensation to the public for Defendants' proportionate share of total natural resource injuries, including Defendants' proportionate share of the Trustees' costs.  Accordingly, the proposed Decrees are reasonable and not an arbitrary and capricious act.  *See Fort James Operating Co.,* 313 F. Supp. 2d at 910 (natural resource damages consent decree was reasonable where the "only imaginable alternative to settlement would be complex and probably lengthy litigation"); *Bragg v.*

---

not the allocations to any individual Defendant.  RC at 52–53.  In any future litigation, the Trustees would not seek the amounts recovered under the Decrees from non-settlors.  *See* 42 U.S.C. § 9613(f)(2) (settlements reduce the potential liability of non-settlors by the amount of the settlement) & 42 U.S.C. § 9607(f)(1) (bar on double recovery of natural resource damages).

*Robertson*, 83 F. Supp. 2d 713, 717 (S.D.W. Va. 2000) ("[I]t is precisely the desire to avoid a protracted examination of the parties' legal rights that underlies entry of consent decrees.  Both the parties and the general public benefit from the saving of time and money that results from the voluntary settlement of litigation.").

Moreover, the Trustees place a high value on early settlements such as those embodied in the Decrees because they address injuries to natural resources on a quicker timeframe than having to wait years for complex and lengthy litigation.  *See*, *e.g.*, *United States v. BP Prods. N. Am. Inc.*, No. 2:12-CV-207, 2012 WL 5411713, at *4 (N.D. Ind. Nov. 6, 2012) (consent decree "serves the public interest by providing these environmental benefits more quickly and at less cost than could be achieved through litigation. . . . [A] risky proposition with uncertain results").  The earlier restoration is implemented, the sooner natural resources injured by releases of contaminants can begin to recover.  The benefits of early restoration are especially important for species at Portland Harbor listed under the Endangered Species Act, 16 U.S.C. §§ 1531, *et seq.; Baker Decl.* ¶ 20; RC at 17 & n.30.

The Yakama Nation and Willamette Riverkeeper questioned whether the restoration projects in the Restoration Credit Decree are appropriate or effective means of restoring injured natural resources.[10]  The Yakama Nation critiqued the four restoration projects in the Restoration Credit Decree as relatively small and isolated, not fully mature, and not integrated into a coordinated restoration strategy.  RC at 76–77.  Willamette Riverkeeper expressed concern about

---

[10] Commenter Northwest Environmental Defense Center ("NEDC") makes many of the same arguments raised by the Yakama Nation and Willamette Riverkeeper.  The response to the comments from Yakama Nation and Willamette Riverkeeper therefore references the NEDC comments as well.  RC at 79.  There is also a separate response to the NEDC comments, in part because NEDC misconstrues the authority and mandate under CERCLA of natural resource trustees.  *See* RC at 60–75.

what they described as the absence of a coherent restoration vision and about high sedimentation levels in a restored aquatic area at one of the restoration projects. *Id*. at 106, 78.

On the contrary, the four restoration projects in the Restoration Credit Consent Decree were selected as part of an overall restoration strategy that already has been presented to the public. The Trustees published their draft Programmatic Restoration Plan and Environmental Impact Statement (PEIS) for public review in 2012 and published the final document in 2017. The PEIS identified 44 projects as examples of the types of ecological restoration projects that might ultimately be implemented, including all four restoration projects included in the Restoration Credit Decree. In their 2021 SRP, the Trustees identified the purchase of credits from those four projects as their preferred restoration alternative for early settlements after additional public review. RC at 79–80, 107–109. Through the public comment process for both the PEIS and the SRP, the Trustees considered all comments received, addressed them, and, in light of the comments, selected preferred alternatives that meet CERCLA restoration requirements as well as the Trustees' restoration objectives.

Nor are the projects small or isolated. The projects range in size from 27–54 acres, and each project has a sufficient variety of habitat types to provide desired habitat "connectivity" from one type of habitat to another. In addition, three of the four projects are in close enough proximity to each other to provide habitat connectivity between them, and the fourth project (Rinearson) is located within Meldrum Bar Park, which provides additional connecting habitat outside of the boundaries of the project itself. RC at 80–81. This means that the habitat provided by the projects does not function in isolation; instead, the projects are mutually beneficial as fish, birds, and other animals move between from one project to another or to other nearby high-quality habitat. *Id*.

As to project maturity, the Trustees are fully aware that mature habitat is more desirable, and they have structured the project development process to achieve that goal. Unlike many natural resource damages settlements, in which restoration project construction does not begin until *after* the settlement is final, all four of these restoration projects already are constructed, with habitat development underway. Dkt. No. 4-1 ¶¶ 22–25; RC at 82. Additionally, each project includes a 10-year performance period for habitat development, followed by permanent stewardship requirements. *Id.* at 82–83. Restoration credits in the projects are only released by the Trustees as ecological milestones are reached, which ensures that the settlement in the Decrees and future settlements are based on actual restoration.[11] *Id.* at 82; *Restoration Credit Consent Decree,* Dkt. No. 4-1, ¶¶ 42, 44.

### D.  The Decrees Are Consistent with the Applicable Statutes

Finally, the Court must consider "the extent to which consent decrees are consistent with Congress' discerned intent" in the statutes at issue. *Cannons Eng'g Corp.*, 899 F.2d at 90. CERCLA, 42 U.S.C. § 9607(a), provides,

> any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, . . . shall be liable for, . . . damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release.

The Oil Pollution Act establishes that parties responsible for discharges of oil are liable for "[d]amages for injury to, destruction of, loss of, or loss of use of, natural resources, including the reasonable costs of assessing the damage." 33 U.S.C. § 2702(a), (b)(2)(A). The Clean Water

---

[11] For example, the Trustees are fully aware of the high sedimentation levels at one of the restoration projects and are working with the project developer to address that issue before releasing restoration credits for the full expected value of that project. RC at 85–86.

Act provides that an owner or operator of a facility from which oil or a hazardous substance is discharged "into or upon the navigable waters of the United States, [or] adjoining shorelines" shall be liable for the costs of removal of such oil or substance, which shall include "any costs or expenses incurred by the Federal Government or any State government in the restoration or replacement of natural resources damaged or destroyed as a result of a discharge of oil or a hazardous substance."  33 U.S.C. § 1321.  Similarly, the Oregon Hazardous Waste and Hazardous Materials Act imposes strict liability "for damages for injury to or destruction of any natural resources caused by a release."  ORS § 465.255(1).

The terms of the Decree are consistent with these objectives.  The Decrees address past releases of hazardous substances and discharges of oil that injured natural resources in the Assessment Area.  The Decrees address those releases and discharges by requiring Defendants to pay cash or purchase restoration credits that will provide habitat to restore injured natural resources, and to reimburse the Trustees for their costs.  Because the Decrees provide effective compensation to restore natural resources, based on Defendants' proportionate share of liability for total natural resource injuries, they are consistent with the purposes of CERCLA, the Clean Water Act, the Oil Pollution Act, and the Oregon Hazardous Waste and Hazardous Materials Act.

Two commenters—NEDC and Willamette Riverkeeper—suggest that the absence of a Biological Opinion from NOAA Fisheries (a/k/a the "National Marine Fisheries Service") frustrates the overarching statutory framework from being fully implemented.  RC at 67, 78.  These commenters seemingly were unaware that the Trustees did initiate consultations with NOAA Fisheries under Section 7 of the Endangered Species Act, and that Biological Opinions were issued both for the Trustees' overall restoration strategy in their PEIS and for the four

individual projects in the Decrees.  RC at 89–91.  The Biological Opinion for the PEIS

concluded that "[t]he long-term beneficial effects of the proposed action on listed species,

primarily improved habitat conditions in the action area, are likely to far outweigh any of the

short-term adverse effects."  RC at 90.  The Biological Opinions for the specific projects

reached conclusions similar to, and consistent with, that of the Biological Opinion for the PEIS.

*Id.* at 90–91.

## IV.    REQUEST TO ENTER THE CONSENT DECREE

The settlement embodied in the Decrees substantially advances the public interest by

implementing restoration of injured natural resources at Portland Harbor substantially earlier

than would occur if restoration waited until this matter were fully litigated to judgment.

Moreover, the Trustees have allocated responsibility among Defendants using a settlement

methodology that is fair to Defendants and non-settlors.  The actions taken by the Settling

Trustees in the Decrees represent a lawful exercise of their authorities under the relevant

statutes.

For the reasons set forth above, Plaintiffs respectfully request that this Court enter each

Decree as a final judgment in this action pursuant to Fed. R. Civ. P. 54 & 58.  As set forth in the

Decrees, Defendants have consented to entry.  Dkt Nos. 4-1 ¶ 104 and 11-1 ¶ 34.

<div style="margin-left: 40%;">

Respectfully submitted,

UNITED STATES OF AMERICA

ADAM R.F. GUSTAFSON
Acting Assistant Attorney General
Environment & Natural Resources Division
U.S. Department of Justice
Washington, D.C.  20530

</div>

Plaintiffs' Motion to Enter Consent Decrees      32

　s/ Michael J. Zevenbergen
MICHAEL J. ZEVENBERGEN
Senior Counsel
Environmental Enforcement Section
Environment & Natural Resources Division
U.S. Department of Justice, c/o NOAA
7600 Sand Point Way, NE
Seattle, Washington 98115
(202) 276-0037
Michael.Zevenbergen@usdoj.gov


STATE OF OREGON

DAN RAYFIELD
Attorney General
State of Oregon Department of Justice


　s/ Sadie Forzley
SADIE FORZLEY #151025
Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, Oregon 97201
(971) 673-1880
Sadie.Forzley@doj.oregon.gov


CONFEDERATED TRIBES OF THE GRAND RONDE
COMMUNITY OF OREGON


　s/ Holly Partridge
HOLLY PARTRIDGE
Senior Staff Attorney
The Confederated Tribes of Grand Ronde
9615 Grand Ronde Road
Grand Ronde, OR 97338
(503) 879-2335

CONFEDERATED TRIBES OF THE SILETZ INDIANS

 s/ Julie A. Weis
JULIE A. WEIS
Haglund Kelley LLP
2177 SW Broadway
Portland, OR  97201
(503) 225-0777

CONFEDERATED TRIBES OF THE UMATILLA
INDIAN RESERVATION

 s/ Joseph R. Pitt
JOSEPH R. PITT
CTUIR Office of Legal Counsel
46411 Timíne Way
Pendleton, OR  97801
(541) 429-7404

CONFEDERATED TRIBES OF THE WARM SPRINGS
RESERVATION OF OREGON

 s/ Josh Newton
JOSH NEWTON
Best Best & Krieger LLP
360 SW Bond Street
Bend, OR  97702
(541) 318-9817

NEZ PERCE TRIBE


 s/ Courtney Johnson
COURTNEY JOHNSON
Crag Law Center
3141 E. Burnside St.
Portland, OR 97214
(503) 525-2728

OF COUNSEL:

Ericka Hailstocke-Johnson
Attorney-Advisor
Office of General Counsel
Natural Resources Section
National Oceanic & Atmospheric Administration
501 W. Ocean Boulevard, Long Beach, CA 90802
Telephone: (562) 980-4070
E-mail: Ericka.Hailstocke-Johnson@noaa.gov

Date: June 9, 2025

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on June 9, 2025, a copy of the foregoing was served on all counsel of record using the Court's CM/ECF system.


    /s Michael J. Zevenbergen           
MICHAEL J. ZEVENBERGEN